***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission affirms with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Worker's Compensation Act.
2. An employee-employer relationship existed between the parties at the times in question.
3. Travelers Insurance is the carrier on the risk.
4. Plaintiff's average weekly wage is $577.99, yielding a compensation rate of $385.35 per week.
5. Defendants deny plaintiff sustained a compensable injury by accident or contracted an occupational disease on or about January 19, 2004.
6. The following exhibits are a part of the record:
a. Industrial Commission forms;
b. Plaintiff's answers to interrogatories;
 c. Medical records from Dr. Bill Jack Parker, Dr. Peter Miller, and Center for Rehabilitation;
d. Personnel records.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 45 years old at the time of the hearing before the Deputy Commissioner and was employed as an upholsterer for defendant-employer, beginning September 2003. Plaintiff worked at least eight-hour days and repetitively used his hands and arms to pull and stretch material tight to upholster furniture. Plaintiff has been an upholsterer for 27 years for different employers.
2. On January 9, 2004, plaintiff saw his family doctor, Dr. Billy Jack Parker, who diagnosed plaintiff with left hand pain. Plaintiff was having occasional pain in his left hand, which was the hand he normally used to pull fabric tight when upholstering.
3. On January 19, 2004, plaintiff bent forward, pulled on upholstery fabric, and felt a snap and pain in his neck that radiated down the arm into his fingers. Plaintiff's left arm became numb, weak and "quit working." Plaintiff told his supervisor, Don Shook, that his arm hurt and was numb and that "something happened" while pulling fabric on a sofa. The Commission finds plaintiff's testimony about the incident and his notification of injury to Mr. Shook to be credible.
4. Plaintiff's pain became so intense that he left work and was driven by relatives to Dr. Parker's office on January 19, 2004. Dr. Parker noted that plaintiff felt his left arm pain was much worse than in the previous three years. Dr. Parker suspected radicular arm pain caused by a spine problem and ordered x-rays and an MRI. The MRI was performed on January 23, 2004 and revealed degenerative changes at C5-6 and C6-7.
5. At his deposition Dr. Parker stated that although plaintiff did not describe the incident at work on January 19, 2004, his opinion was that there was likely a correlation between plaintiff's neck and arm problems and the pulling incident. Dr. Parker also stated that plaintiff's job as an upholsterer may have been a contributing factor in the development of his arm and hand condition and placed him at a greater risk of developing hand and arm problems as compared to members of the public not so exposed.
6. Dr. Parker referred plaintiff to Dr. Peter Miller, a neurosurgeon, who began treating plaintiff on January 29, 2004. Dr. Miller determined plaintiff had significant spondylosis bilaterally at C5-6 and C6-7, as well as left ulnar nerve neuropathy compression. On March 9, 2004, Dr. Miller performed fusion surgery on plaintiff's spine at C5-6, C6-7.
7. Although plaintiff did not describe the incident of January 19, 2004 to Dr. Miller, it was Dr. Miller's opinion that if the incident occurred as plaintiff testified, plaintiff's spine condition was more likely than not related to his job. When asked at his deposition whether the incident in which plaintiff leaned over and pulled material was a causative factor in plaintiff's spine condition, Dr. Miller explained as follows:
 He's [plaintiff] had those bone spurs probably for some time, and we see this fairly frequently where you will have bone spurs in your neck and you will — they will not be causing any problems and then some type of trauma — you know, as Mr. Lowe described, . . . can irritate the nerve and cause problems with the nerve from that point on; so it's definitely possible, although the bone spurs were probably present for some time.
Upon further questioning Dr. Miller explained that by using the term "definitely possible," he meant that the job duties could or might have been a causative factor in the development of plaintiff's back condition.
8. Following the back surgery, plaintiff continued to experience numbness and weakness in his left hand. Although Dr. Miller released plaintiff to return to work on May 6, 2004, he again took plaintiff out of work on May 24, 2004 and referred plaintiff for physical therapy. On July 27, 2004 the EMG/NCV tests were repeated and showed mild ulnar neuropathy of the left elbow.
9. Dr. Miller performed left ulnar nerve decompression surgery on August 24, 2004. The surgery revealed significant compression of the nerve at the elbow and where the elbow entered the forearm. As of December 16, 2004, plaintiff had started physical therapy for work conditioning and Dr. Miller planned to have plaintiff submit to a functional capacity evaluation. Dr. Miller had plaintiff on no work status during the time he treated plaintiff except for the period from May 6 through May 24, 2004. Plaintiff is not at maximum medical improvement and has not been released to return to work or rated for any permanent functional impairment by Dr. Miller.
10. Dr. Miller stated at his deposition that ulnar neuropathy can either be caused or substantially aggravated by repetitive use of the arms. He further explained that repeated bending of the elbow can cause microtrauma and set up scarring around the area where the nerve goes around the elbow and over time can compress the nerve. Dr. Miller stated his opinion that plaintiff's job duties were a causative factor in the development of his left ulnar neuropathy and that plaintiff's job as an upholsterer exposed plaintiff to a greater risk of developing ulnar neuropathy than members of the general public not similarly employed.
11. Based upon the greater weight of the medical evidence, the Commission finds that on January 19, 2004 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer which resulted in an injury to his cervical spine.
12. The Commission further finds by the greater weight of the medical evidence that plaintiff's left ulnar neuropathy was causally related to his employment and that he was at an increased risk for developing this condition due to his employment.
13. Plaintiff has not worked in any employment since January 19, 2004. He was terminated for excessive absences in violation of defendant-employer's attendance policy on February 11, 2004. Plaintiff received unemployment compensation in the amount of $295.00 per week, for a total of $4,130.00, for the period May 9, 2004 through August 14, 2004.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On January 19, 2004, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer as the result of a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6).
2. The repetitive nature of plaintiff's job duties caused or significantly contributed to the development of plaintiff's left ulnar neuropathy, which was characteristic of and peculiar to his particular employment. Plaintiff's ulnar neuropathy is not an ordinary disease of life to which the general public not so employed is equally exposed and is therefore a compensable occupational disease. N.C. Gen. Stat. §97-53(13); Booker v. Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
3. Because plaintiff's claim was denied, plaintiff has the burden of proving disability, defined as a loss of wage earning capacity. Russellv. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than her pre-injury wages. Demery v. PerdueFarms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. LowesProduct Distribution, supra. When a plaintiff meets his burden of showing disability, the burden then shifts to defendant to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc., supra.
4. In the present case the medical evidence shows that plaintiff was disabled from any employment from January 19, 2004 until May 6, 2004. From May 6, 2004 until Dr. Miller took plaintiff out of work again on May 24, 2004, plaintiff was capable of some work but was unable to obtain employment after making a reasonable job search as shown by his eligibility to receive unemployment benefits. After May 24, 2004 the medical evidence shows that plaintiff was taken out of work and was disabled from any employment. Therefore, as the result of his cervical spine condition and left ulnar neuropathy, plaintiff was totally disabled from any employment and is entitled to temporary total disability compensation at the rate of $385.35 per week from January 19, 2004 and continuing until further Order of the Commission or until plaintiff returns to work. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to payment by defendants of all reasonably necessary medical treatment related to his spine and left arm and hand conditions, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or may tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25,97-25.1.
6. Plaintiff has not yet reached maximum medical improvement. Accordingly, the issue of the amount of any permanent partial disability that plaintiff might receive is reserved for future decision. N.C. Gen. Stat. § 97-31.
7. Defendants are entitled to a credit for any unemployment compensation paid plaintiff. N.C. Gen. Stat. § 97-42.1.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee awarded below, defendants shall pay plaintiff temporary total disability compensation at the rate of $385.35 per week beginning January 19, 2004 and continuing until further Order of the Commission or until plaintiff returns to work.
2. Defendants are entitled to a credit for any unemployment compensation paid plaintiff under North Carolina Employment Security Law.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable occupational disease, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or may tend to lessen plaintiff's period of disability.
4. An attorney's fee of 25% of the compensation in paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly by defendants to plaintiff's counsel.
5. Defendants shall bear the costs.
This 18th day of November 2005.
 S/_______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_________________ DIANNE C. SELLERS COMMISSIONER
 S/_________________ PAMELA T. YOUNG COMMISSIONER